This is the third case of the morning. Eyob, perhaps, but I'll be corrected, v. Mitsubishi. You may proceed. Good morning, Your Honors. My name is Pam Bray, and I represent the appellant Ephrem Eyob, or I pronounce it E-yob, and I'm— Well, I think we should, too, then. We'll call it E-yob for today. So employers and supervisors who choose to discriminate on the basis of race have become too sophisticated to do so by using racial slurs or to leave glaring tracks if they're going to terminate or discharge an employee for a racial basis. Their discriminatory motives are hidden within neutral remarks about business necessity, the employee's inadequate work performance, and other means of expressing animus. This was written by this Court over 20 years ago—I'm sorry, 23 years ago—in Barnes v. Yellow Freight Systems, Inc., and as it was true then, so those businesses have become even more sophisticated in hiding their racial terminations and their animus in language and in actions that are not so easy to read. Mr. Eyob's termination is the legacy of this level of sophistication of racial animus and action. In this case, the McDonnell-Douglas framework actually begins at Mr. Eyob's burden to produce substantial evidence of pretext because at the level below, the employer conceded Mr. Eyob had met his burden, his prima facie burden, and at this level of the appeal, Mr. Eyob has agreed that the employer really did produce sufficient evidence to meet the production burden. So what we get to is the analysis of whether the evidence produced by Mr. Eyob does in fact prove sufficiently pretext to move forward, and in fact, I want to go through that evidence because as will be seen, that evidence does indeed show that the employer was acting with animus and that the employer discharged him on a pretextual basis or gave the court a pretextual basis below, when in fact it was racially based. This evidence, I don't know whether it's easier or more difficult, Mr. Eyob and the employer used almost all the same evidence below. Almost all the same evidence was submitted by both in the summary judgment, and so it's clearly just a matter of interpretation. And Mr. Eyob would show the court that because he is entitled for the evidence to be viewed in the light that is most favorable to him, that it is his interpretation of the evidence that this court should look at in making its determination. Now, we'll start with the metrics. There were actually metrics that are in the summary judgment evidence. The employer, Mitsubishi Caterpillar, argues that Mr. Eyob's job evaluations were lower than his two colleagues who were also plant supervisors in that workplace. So all three men are plant supervisors, and they argue that his evaluations were, in fact, unsatisfactory or lower than. In terms of looking at the subjective writings, the subjective written part of those evaluations by Mr. Chasteen, the supervisor who terminated him, that would on its face appear to be true. However, those evaluations have a lot of metrics in them, and Mr. Eyob would show that when you look at the metrics, the fact that the three plant supervisors had nearly identical, often quite identical, but certainly comparable values, but that Mr. Eyob was given subjectively really not low evaluations, just meeting expectations as opposed to exceeding them, so not so much lower, but those subjective evaluations actually go toward Mr. Eyob's burden to show that there was a racial animus at work, along with other evidence of racial animus. In comparing those evaluations, tab six of the evidence shows Mr. Eyob's evaluations, tab seven shows Mr. Wee's evaluations, and tab eight shows Mr. Hilgert's evaluations. At the half-year mark, the three were at 81 percent, 86 percent, and 86 percent, respectively, with Mr. Eyob being a bit lower. But the important thing to note is that the summary judgment evidence shows that when that evaluation had been done in the mid-year of 2013, Mr. Eyob had only been a supervisor for about three months. He was elevated in May of 2013, and so his mid-year, which was done just slightly later than the mid-year, was based on his taking over a position that somebody else had occupied, and yet he was evaluated at 81 percent of 95 in one criteria. He was at 2.3 out of 3.4 on safety, while the others were just .1 above him at 2.4. He was only one and a half percentage points below the two of them on quality audit, line one. He was above both of them on quality audit, line two. He had the same number of hours per unit, and all these metrics are actually in the evidence. And he had an 87 percent, over 80 percent, on his impacts criteria, although there's no evidence, no evidence was ever presented of what these values completely mean. But the other two were much lower, or certainly Mr. Wee was under 50 percent. Let me, let me interrupt you. As I, the way I look at this, you know, just from the work I've done at this point, he was, at least in terms of the numbers, relatively close to these other people. But what precipitated his discharge was the problem that occurred with the, whatever it was that came off the line. I forgot what these people make, but whatever it was, there was a major problem with that, and he got fired because of it. I mean, so I guess the question is, let's say that your argument is right, to the extent that it focuses on the fact that there wasn't a big discrepancy between him and these other two managers in terms of how they were evaluated. But the problem that occurred on the line that he was supervising seemed to me to be the straw that broke the camel's back. And so the, could you address that? Absolutely, Your Honor. So I'm going to jump to tab 9, because in tab 9, this Court will see that the issues that were at play in the problems with the trucks, they were calling them trucks, I think they're sort of like forklift trucks, that were being manufactured on the lines, and line 1 in particular, which is the one that Mr. Eob supervised, that the company was attempting to learn why it was that there were problems. And in Exhibit 9, the Court will see that the engineering department was looking into those problems. And in an email, April 10, 2014, which was just after Mr. Eob had received a merit raise, the engineering management began discussing what the problems were. And they stated that they were having to make a new assembly, E.O. Now, although E.O. was never part of the summary judgment as to what it means, it is most likely, because it's a manufacturing company, an engineering operation. So it would be a plan. But that wasn't in the summary judgment evidence. But nothing as to what E.O. was. But the engineering department was having to create a new assembly. Now, relevant to that, Mr. Eob's job description, which is in the evidence, and it's the same job description for all three of those plant supervisors, nothing in that job description discusses that Mr. Eob is to do any engineering or troubleshooting of engineering. That job description required somebody to have an associate's degree, a two-year degree, and I believe it was two to four years of experience, which is not what one would have if they were expected to re-engineer the line. And in— One of the gaps, perhaps, in the evidence, but I'm going to ask each of you about it. I mean, it's not as much of a gap. It's not clear exactly what it is that Mr. Eob was supposed to have done that he didn't do, or did that he wasn't supposed to do. But it does seem to me that regardless of his skill set as supervisor of that line, he could, having been aware of this problem, which existed before and had been somewhat addressed, stay on top of it better, more regular checks on the forklifts that came off or otherwise, some sort of testing to make sure that the problem was not recurring, or in some way watching this fix each time it was done in a forklift, at least on a sample basis. Now, those are just surmises, and it's not in the record, but it does seem to me his absence of an engineering degree or whatever you think might be most appropriate is not what a supervisor needs to keep track of whether some fix is continuing to be made. So what is in the record along the lines that I'm talking? So, Your Honor, you're correct that the record is not as clear as it ought to be on what Mr. Eob should have been doing differently. So we have to look at the job evaluation, and I would suggest that those, those, that the objective metrics as opposed to the subjective writing, which again is not so bad. He's meeting expectations in all cases. It also says that the quality focus scores have been very low. It needs to do more work on customer satisfaction. It's certainly not a glowing report. That's right, Your Honor. In the subjective writing, it does say that his, that his customer service is low, and then when you turn to those metrics, which are on the, the second page, or probably I think it was the back of the evaluation at that time, it, the metrics do not show that he was lower in those customer service criteria. And in fact, and I'll come back, Judge Sopwith, to your question. I just want to say if you look at the end of year, in fact, his soft skill was ranked at, at 35 percent, and it was written unacceptable by Mr. Chasteen, while Mr. Wee got a much lower score of 16 percent, and there was no comment on his at all. And to go back to your question, Judge, the, we have to look first at that job evaluation, where the comparable numbers that are metrics tell the story. Second of all, you asked, shouldn't Mr. Eyob have been responsible for, as the supervisor, knowing what was coming off the line? And it's, his job, if you look at the description, is to communicate with the employees, to, to make sure they are doing their jobs, to keep the overtime down, to make sure they're doing what they need to do. In terms of whether the machinery was meeting the standards, the company had, in the engineering department, audits. And those numbers are set forth in Exhibit 9 that show, in detail, the audit findings for that period of time when Mr. Eyob, 2013, when he was supervising. And they never say, so, so engineering itself is responsible for the audits and for making sure things are right. They never blame Mr. Eyob. They never put fault in Mr. Eyob. But what they do is they talk about the need for new assembly. And in fact, in the first page of Tab 9, which is the record at 300, and, and for a couple pages thereafter, they did, they, they set out the evaluations that they got from 200, I'm sorry, 397 of the employees who talked about what the problems with the manufacturing problem were, or process were. Both the good and the bad, I suppose. They're not clear about that. But they do give line items on some of the questions asked. And interestingly enough, in the physical plant category, the summary by Carl Modisette, which is in, in an affidavit that was presented as summary judgment evidence, Mr. Modisette, in an email dated April 23, 2014, so just before the termination, wrote that the physical plant, the survey showed fixtures and jigs, many comments, old, worn out, ineffective, simply absent. The raw materials, poor quality steel leads to poor quality parts. And by the way, there's no, there's no good listed here. It's all the, the bad parts of the manufacturing process. All the problems that were on these lines that had to do with the engineering and the overall, and again, not once, as Mr. Eob mentioned, it was not his fault. That's what the summary judgment evidence showed. Poor, it says part qualities, many comments. It says needs better inspection. Tools, many comments, new or better tools needed. Design for manufacturability. Issues don't seem to be fixed. Suggestions not incorporated. The plant had a lot of problems. But not one of those problems is attributed specifically to Mr. Eob. And viewing that in a light most favorable to Mr. Eob, what that means is that the excuse of his poor performance is exactly what this court previously wrote about. That in retrospect, if you're getting rid of someone for an improper, non-lawful basis, and what you do is you then look back in time and say employee performance. And your evidence, I'm sorry, go ahead. You can talk to us some more when your opponent is finished with his argument. Thank you. May it please the court. The court should affirm both of the district court's summary judgment findings, both on racial discrimination and on the hostile work environment claim. As to racial discrimination, under the McDonnell-Douglas framework, Mitsubishi had a legitimate, non-discriminatory basis for Eob's termination. Now, what was that exactly? It started with the second occurrence of the major malfunction on the hydraulic lift. And I think it's, I'm sorry, the hydraulic lever. I think it's important to discuss and maybe an answer to Judge Southwick's question, sort of how that came about and what that evidence is. In late 2013, a bunch of customers complained, so many so, in fact, that they had to shut down the production on Eob's line and rework every truck in the line. That testimony, page 456 of the record, was from Vice President of Design, Kevin Krikora. I've seen this evidence and certainly go through it. But what I'm looking for is how is any of this his fault? I mean, so continue, but you can sort of highlight why, what is it that he should have done or did not do that would have fixed whatever it is you're talking about? I think I'll answer in two ways. One wasn't, Appellant's argument boils down to he should have been an engineer to have caught these problems or to fix these problems. And I think neither of those things are true. As to who should have discovered the problems, he, being the supervisor on that line, was responsible for that. And we know this— The audit fit in that your friend on the other side was talking about. It sounds like, is there some quality check by some other department as these forklifts come off? No, Your Honor, we would suggest that that was Eob's responsibility. If you look at page 35 of the record excerpt, which is also 225 of the record on appeal, and then the following page after that, these are the job description of a plant supervisor, the duties that he had. Under the position summary section, his responsibility was to achieve target and safety and quality. So achieve the target and quality. He was supposed to make sure customer satisfaction and quality were a major priority. And he was supposed to ensure quality products are produced according to the specifications. He was supposed to achieve daily production targets. Those are the duties set out in his job description. And then if you look on the next page, 36 of the record excerpts, or 226 of the record on appeal, his principal duties include supervise and evaluate the production staff to ensure quality products are being produced according to specifications. And he's supposed to make recommendations for process and equipment changes to make improvements. And I think in the context of all those duties, it's important to understand that both in 2013, and then when the problem occurred again in 2014, the discovery was by the customers complaining about the trucks overheating and having to be taken out of service. There's no record evidence suggesting that the customers were engineers, suggesting that only an engineer could discover that this problem was occurring with these trucks. And there's no evidence that Iyab ever went to his supervisor and said, we've got these problems. These aren't being, we can't manufacture them in an appropriate, in a working fashion. But Iyab seems to suggest, his argument boils down to, as a supervisor of an assembly line, he had no obligation to make sure that his line was building working vehicles. And that just defies common sense. Excuse me, both sides are kind of coming at this in the same way, which has sort of given us too general a description of what was going on there. Is there anything in the record that says at station four of this assembly line, when the levers were installed, Iyab should have been there looking at the installation? Or should have been at the end of the assembly line and tried the lever? I mean, there's no specificity to this that I have seen. Is it in the record? And I just haven't seen it? I don't know. You're telling me that he's in charge of quality. Okay, great. But if something comes off bad, I can, I mean, what we're worried about is pretext. And you don't get rid of a good employee who's basically doing his job, and they haven't figured out what the quality problem is. But you might get rid of a problem employee if you have some problem that's not really his fault and it's coming off his line. So some specificity would help your case. Well, I think those duties that I just described do encompass his obligation. And I think next it's important to look at what exactly were the problems that were being discussed and discovered. And if you look at record excerpt page 52 and 51 and 54, these pages relate to the investigation that the company took after customer complaints in 2014 led them to, once again, reassess the trucks. And when they did this assessment, they found that 11 of the 17 trucks had a hydraulic lever that was, quote, not adjusted. They had others that were missing a part. And they had others that were not set up correctly. And so while it doesn't say which of the more than 50 employees that worked on that line might have caused that problem, the idea that they were not adjusted or that parts were missing are clearly the sorts of things that at the end of the process, a supervisor who's doing his job and evaluating the forklift truck that his line has made would catch because they're caught once they do actually take a time to assess them down the road. And so this evidence ties into what his obligations were as a supervisor of this assembly line. I think it's important to remember that this was not an employee who was performing at a standard generally. There are lots of metrics on which he was measured, but the most important one was quality. Eob testified that he knew that quality was paramount, that they discussed quality at every stage, and his midyear quality score was 76.5% out of a goal of 90. By the year end of 2013, it had gone up slightly to 78%, but that was still more than 10 points below the company goal. And so over that course of many, many months, leading to the year end of 2013 and then continuing on into 2014, the problems were on his line. They weren't on the line supervised by Mr. Wee. They weren't on the line supervised by Mr. Hilgert. Those lines supervised by those two other people are exactly the same. They produce the same, what is it, a truck? No, Your Honor. Mr. Hilgert's line produced a different truck. Mr. Wee's line did what they called final finish, clean up, maybe putting the decals and the logos and things on the truck. They were not assembling the truck themselves. It's important to understand also pages 456 of the record and 507 when Krikora is testifying. He said, actually, you'd expect better results on Eob's line. He said Eob had more employees, but as a result, each person only had to remember about seven minutes worth of work. On Mr. Hilgert's line, it was building a different truck with fewer employees. Each employee had to remember about 30 minutes worth of work. And so what you would expect would be the employees with fewer job responsibilities would make fewer mistakes. It's that you'd expect better quality off of Eob's line, but over the course of many, many months reflected in those scores below 80 percent, that wasn't happening. And so to answer Judge Southwell's question, it wasn't an employee whose line was performing up to snuff that just had a rough patch in 2013 and 2014. Vice President Gussler testified in the 2014, I'm sorry, he emailed in 2014. They were worried they were going to lose customers if these trucks kept leaving the factory in this condition. And so as a result of that inspection, which led to the discovery that there were problems of failure to adjust or failure to put parts on the trucks that were coming off Eob's line, the decision was made to terminate Mr. Eob. How long was he employed by Mitsubishi? I believe it was 13 or 14 years. And as a supervisor, he had two stints. So he was employed for 13 or 14 years and he was promoted to supervisor. So, you know, that's not the usual case that we get with raising the legal problem that yours is raising. I mean, obviously he was successful to some extent, or he wouldn't have been there 13 or 14 years and he wouldn't have gotten promoted to supervisor. So, you know, my question about this case for what it's worth, maybe not much, is, is it a summary judgment case? I mean, that's the question. And the answer to that question is yes, Your Honor, because as you mentioned, he did get promoted at times and then he got promoted a second time to supervisor. But at the core of it, his line was not producing. The evidence is... And this record has testimony in it that makes very clear that if the supervisor had been doing his job, his line wouldn't have had these problems. I think at a minimum, the record is very clear that the supervisor doing his job would have caught the problems. They would have never gotten to the customers. They would have never gotten off the line. They wouldn't have happened in 2013, been fixed for a time, but then whether it was through lackadaisical work or what have you, the problem occurred again. And I think the volume of problems, when they did the 2014 review after the customers complained, 11 of 17 audited trucks had a hydraulic lever problem and there were 16 trucks in the shipping center. Of those ready to go out, of those, 15 of them had problems. And that was work from February and March leading up to April. And so that's a large period of production that wasn't satisfactory. And so as a result of that evidence, and Eob has no... You know, we can talk in a moment about the racial animus and other pretext evidence he points to, but none of that can overcome the significant, systemic problems with the production on Eob's line. Well, Mr. Ray, it does have at least some suggestions from the information about how inadequate the assembly line was and how the tooling was not being properly maintained. I don't know what the profit margin was for your company. I hope a very good one. But it does seem to me there are other explanations in the record of just what might have been going wrong at that line. And so my concern is, without more evidence of what Eob didn't do, or that he didn't catch it, I don't have a sense of... You haven't given us a sense in this record of how he would have caught it, or how a good supervisor would have caught it. And that... I don't know where we're going to go with this case, but you do have other issues to discuss, and maybe you ought to address those. Well, I'll answer that point just to say, a good supervisor would have noticed that 15 of 16 trucks that were built on his line were in a state that had previously caused the company to shut down production entirely because the trucks they produced were overheating and they got so many customer complaints, they were worried about losing customers. To have all of those trucks leave Eob's line and him never catch them, not in 2013 and not in 2014, for him to not provide any sort of quality check is absolutely inconsistent with the job descriptions, including some that were essential functions, on page 36 of the record excerpts of his job. Your point is basically the buck has to stop somewhere. He is the supervisor after all. And the record reflects that that was his responsibility. Yes, Your Honor. And doubtless that also reflects that when he was replaced and they put in somebody else, that these problems were eliminated. I'm sure it reflects that too, right? What the record reflects, and it's discussed in the briefing, is that a new supervisor in a new line was put to build the trucks. And about a week later, they experienced the problems again. And so Mr. Eob suggests that that's evidence of pretext. And as we mentioned, or sorry, as we discussed in our brief, it's not because Mr. Eob was not terminated in 2013, the first time his line had a problem. He wasn't terminated until six months later when it occurred again. So it is not a similarly situated employee who was not fired the first week his line takes over and is in a training period to build this new, what is a new truck, not just to the supervisor, but to the workers on the line. And so Eob suggests there are sort of three categories of pretext. Once you finish that thought, I thought maybe you were continuing with it. Is there evidence beyond that first week of the next supervisor or whatever the time it was? Does it show six months later, or otherwise everything's blowing and going, there's no more problem? Not in the record. So we really don't know. The problems could be recurring, but it's just not in the record. I'm not asking you to testify in front of us here. It's not in the record whether the problem was fixed or not fixed. Yeah, that did not come out during the discovery. All right. So like I say, he has three sort of categories. One, he points to the failure to use a progressive disciplinary policy. There are five things to note there. The policy on its face was not a mandatory policy. That's page 361 and 369 through 370. There's no evidence that his supervisor, Chastain, ever used the policy. Eob himself testifies that he never saw Chastain use the policy. That's pages 291 and 257. Eob, when he was supervising employees, never used the policy to discipline his employees. That's at page 256. And the HR director testifies at 498 and 499 that for other terminations that did not follow the written progressive disciplinary policy, the most common cause of termination was poor work performance. Taking all of that in the context, there is no evidence that this policy was followed for non-minority employees but not followed for Mr. Eob. So under Turner at 476 F. 3rd, 346, and Taylor, this court's case, 322 Federal Appendix 367, there is no pretextual evidence with respect to the immediate termination of Mr. Eob. Second, he talks about similarly situated employees, but he must show they're nearly identical in circumstance. And as we discussed earlier, the other supervisors dealt with other lines. They had better... This was a new truck, you said? A new truck. This line, this line that he was supervising, it was new in some way, the truck involved? I don't know when they started producing the truck. He transferred to a line that I believe had already been producing the truck. And when he became a supervisor in May 2013, I'm not sure how long the line had been producing the truck before then. When I said new truck a moment ago, what I meant was after Eob's termination, they terminated the truck... Sorry, they transferred the production of the truck to a different line. So that truck was new to a new set of... It was new to that set of workers is what I meant. So second, similarly situated employees, Eob fails to meet that standard in many ways. Both the different work, the different history, the different problems, and there was no evidence that this problem could have occurred on any line but Eob's. And so with all of that, he cannot make the nearly identical circumstance assessment that he would need to show that he was similarly situated to someone who did not get terminated. And then finally are the racial animus evidence, which the district court correctly recognized are troubling comments. And because the district court has to review them in the light most favorable to Eob, even though many of those incidents were disputed, the district court credited them all. And he said, even with that, and even though I take them all collectively, these are not sufficient because they're vague, they're remote in time, they weren't related to the actual incidents themselves. They are not evidence that would overcome the work performance justification for the termination. And so under this court's Auguster opinion, that's not evidence of pretext. It's also important in Palo Soto versus Hagar Clothing, this court has said, if there's no other evidence of pretext, then you can't use stray remarks or racial comments to establish pretext when it's circumstantial evidence by itself. And so Eob offers no evidence of racial animus on behalf of Vice President Krikora, Vice President Gustler, anyone else involved in the discussion of the situation in 2013 or 2014 or in the termination decision. And there's as a result, no evidence that his valuations were a result of racial animus. Eob himself testified that he deserved generally meets expectations, which is the third lowest of the four ratings. He testified at page 237 of the record on appeal that that was a fair evaluation at midyear. And so while the district court found the incidents that Mr. Eob discussed troubling, he said in the light of all of the evidence and the weight of the evidence that suggested that work performance was suffering and had been insufficient, that on balance, there was no evidence created by the stray comments by Supervisor Chastain of pretext. And so if there are no more questions on that, I will say on his second claim, hostile work environment, as we say in the brief, he writes only a paragraph. He's basically abandoned the claim because he doesn't set out to meet or even discuss what the standards for that claim would be. His own testimony refutes the element on terms, conditions, and privileges of employment because he says none of those were affected by each of the incidents, which he complains of. And he never notified the HR department of any of those incidents, so he didn't give his employer the opportunity to correct a problem of which it wasn't made aware. And so beyond that, unless there are questions, we'll rest on our briefing. All right, counsel. Thank you. Ms. Fray? Your Honors, I want to first respond to the claim that Mr. Eob failed to meet the nearly identical standard or substantial similarity, and I would turn the court to the decision in Turner, which counsel referenced. And in fact, I believe the test there is quite clear that if the folks have the same job or responsibilities, and that is in tab, I believe, 5, that they all had that same job description. If they have the same supervisor, Mr. Chastain, the evidence shows was their supervisor. And essentially comparable violation histories, and while there are no evidence that any of them had any actual violations, I would turn the court again to the end-of-the-year evaluation. I talked about the mid-year, the end-of-the-year evaluation, the record at 198, 218, and 223. Compare the three supervisors and you will find Mr. Eob's scores were above the other two supervisors at the end of the year. 86% versus the other two at 81. 2.4 on safety. The other two were 2.3. I could go on, but in light of my time, I want to turn to the next thing. I want to refute the statement that they did find that Mr. Eob should have been the one to catch the issue. Mr. Chastain said that it was a performance issue and said that it was because Mr. Eob didn't catch the lever issue. Mr. Krakora, who counsel cited in the record at 49, said that the lever issue had absolutely nothing to do with safety. It was never considered a safety issue, not even after further consideration. And nobody was disciplined. In response to the- I'm not quite sure what you have just told us. The problem with the lever, are you saying there's no evidence in there that he was held responsible for the continuing problems? There was, except for Mr. Chastain's later testimony, there is no contemporary evidence anywhere in the evidence that was presented on summary judgment or in the record that Mr. Eob was responsible to do to determine an engineering problem, which there is no doubt that they had an engineering problem during the brief period of time when he was a supervisor, less than a year, and after he had left. And there is no evidence, as counsel stated, that the problem ended at any particular time. We just don't know. There was no evidence of it one way or the other way. The problems, the evidence of the problems were not eliminated would have been helpful, but even more helpful is the fact that Mr. Eob did get a merit raise in tab six. You'll see he got a merit raise just a month before the termination. Wasn't the problem on the line, whatever the cause might be, had not yet been discovered, had it? They were working on it, but at the time there has been no evidence one way or the other that it was ever Mr. Eob's fault. And that would be true. I'm not saying that, but the fact that problems were occurring had not yet been discovered when he got that merit raise, had it? Well, I think counsel said he actually, they knew that they had a problem in 2013, and he got the merit raise in 2014. Okay. So then the final thing is on the animus. I want to say this. I think it's, there is substantial animus testimony. Mr. Eob testified that Chasteen, who's the one that terminated him, called all black workers, Mr. Wayne, after a previous employee who was a black man named Mr. Wayne who was gone from the workplace. And it's highly offensive to identify all, or just say you are all fungible. That was said 20 to 30 times during that period of time. I see my time is up. I ask the court to reverse and remand. All right, counsel. Thank you both.